RF:SLD
F.#2008RO1522

**M08-1019**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

JOSEPH IORIO,

       Defendant.

- - - - - - - - - - - - - - - X

SEALED AFFIDAVIT
IN SUPPORT OF AN
<u>ARREST WARRANT</u>

(T. 18, U.S.C., §§ 1341
and 1346)

EASTERN DISTRICT OF NEW YORK, SS:

       DANIEL HELZNER, being duly sworn, deposes and says that he is a Special Agent with the United States Department of Transportation, Office of the Inspector General, duly appointed according to law and acting as such.

       In or about and between March 2008 and October 2008, within the Eastern District of New York and elsewhere, the defendant JOSEPH IORIO did knowingly and intentionally devise a scheme and artifice to defraud his employer, Yonkers Contracting Company, Inc., by depriving it of the intangible right to the honest services of the defendant, and for the purpose of executing and attempting to execute such scheme and artifice did cause to be deposited a matter or thing with a commercial interstate carrier, to wit: price proposals.

       (Title 18, United States Code, Section 1341 and 1346).

The source of your deponent's information and the grounds for his belief are as follows:

I.   QUALIFICATIONS AND SOURCES OF INFORMATION

1.   I am a Special Agent with the United States Department of Transportation, Office of the Inspector General ("USDOT OIG") and have been so employed since April 2002.  As part of my duties as a Special Agent, I investigate criminal activity impacting recipients of Federal Highway Administration ("FHWA") and Federal Transit Administration ("FTA") grant monies. During my career as a law enforcement officer, I have participated in numerous criminal investigations during the course of which I have conducted physical surveillance, interviewed cooperating witnesses and defendants, executed search warrants, and reviewed and analyzed recorded conversations in which criminal activity is discussed.

2.   The facts set forth in this affidavit are based upon my own investigation and information that I have learned from review of written documents prepared by, and conversations with, other law enforcement officers who have participated in this investigation, as well as a confidential source of information, who has proven reliable in this investigation (the "CS").  More specifically, in the portions of this affidavit that describe recorded communications, the information, unless otherwise indicated, is based upon my review of the recording or

2

portions of the recording.

3. In this Affidavit, I have described portions of certain conversations that were recorded with the consent of one of the participants. I have not, however, summarized every pertinent recorded conversation, nor have I included every pertinent part of the conversation that I have summarized. Moreover, any transcripts of recorded conversations are preliminary and in draft form. As such, the summaries and quotations set forth in this affidavit are preliminary in nature. My opinions concerning the meaning of coded or veiled conversations are based, in part, on my training and experience developed as a result of investigating criminal activities, my discussions with other experienced law enforcement officers, my conversations with the CS, as well as the facts and circumstances of this investigation.

4. Unless otherwise indicated, identifications of participants to the recorded conversations in this investigation were made by the law enforcement officers reviewing the recordings, with the assistance of the CS. Officers initially identified the participants to conversations through their identification of themselves by name during the course of the conversation. When possible, such identification was corroborated by, among other means, the CS who has been used in this investigation. Thereafter, the participant would be

3

identified through either the use of their name or voice
identification based upon comparisons with prior or subsequent
recordings of that individual.

     5.    As set forth in the paragraphs below, I believe
there is probable cause to believe that the defendant JOSEPH
IORIO devised a scheme to defraud his employer, Yonkers
Contracting Company, Inc., by soliciting kick-backs in order to
award work to individuals.[1]

II.   Introduction and the Scheme to Defraud

     6.    The New York State Metropolitan Transportation
Authority ("MTA") is a public benefit corporation responsible for
various modes of public transportation in southeastern New York
and in two counties within southwestern Connecticut.  There are
various agencies that fall within the jurisdiction of the MTA, to
include the Long Island Rail Road ("LIRR"), New York City Transit
("NYCT"), and Bridges and Tunnels ("B&T").  The MTA is a
recipient of USDOT grant monies.  In Fiscal Year 2007, the MTA
received approximately $3.28 billion in USDOT grant monies.  In
Fiscal Year 2008, the FTA obligated approximately $1.24 billion
in grant monies to the MTA.

     7.    Yonkers Contracting Company, Inc. ("YCC"), located

---

   [1]  I have not set forth all facts known to me about this
investigation and case, but only those facts that appear to me to
be necessary to establish probable cause to believe that the
defendant committed the charged offense.

4

in Yonkers, New York, is a general contractor specializing in publicly financed transportation projects, among other commercial developments. In order to complete these projects, YCC subcontracts various work to other companies. One such type of work is the transportation of construction and demolition debris from a project's work site.

8.    In general, publicly-financed projects are awarded by means of sealed bids submitted by general contractors seeking the work. These bids contain, among other things, the price for which the general contractor will agree to complete the project. Based upon my training and experience, I know that general contractors initially seek and select bids from subcontractors who specialize in the work needed to be performed for the specific project. The bids of the selected subcontractors are made part of the general contractor's bid for the project.

9.    The defendant JOSEPH IORIO is the Vice President of Construction of YCC. IORIO has been an employee of YCC since 1978. Based upon the investigation conducted to date, the defendant JOSEPH IORIO is responsible for collecting bids from subcontractors for selection by YCC.

10.   This investigation has revealed that the defendant, while employed by YCC, solicited kick backs from the CS (an owner of a trucking company that hauls construction and demolition debris for disposal). Specifically, the defendant

5

IORIO requested that the CS include kick-backs for IORIO in price proposals to be submitted to YCC.  In return for these kick-backs, IORIO would use his influence as a high-level YCC employee to ensure that the CS's company was to be used by YCC, provided that YCC was awarded the various projects.  The evidence further revealed that the defendant directed the CS to pay him kick backs by check, made payable to a business entity associated with IORIO named "JJA Construction Company, Inc." and to keep their arrangements discrete and hidden from YCC.  In executing this scheme, the defendant caused to be mailed various documents, to include trucking price proposals, via an interstate commercial carrier.

A.    The Hudson Yards Project

11.  At all times relevant to this affidavit, the MTA operated the LIRR rail yards known as the John D. Caemmerer Rail Yard located in New York County.  In or about May 2008, the MTA entered into an agreement with private entities to create, with public and private financing, a "mixed use development"[2]  at the site of the rail yards while maintaining the integrity of the LIRR train operation (hereinafter, the "Hudson Yards Project").  YCC was a prospective bidder to perform contracted work on the Hudson Yards Project.

---

[2]  A "mixed-use development" is a development consisting of housing, commercial office space, and retail space.

12.   On March 27, 2008, at the direction of law
enforcement, the CS placed a recorded telephone call to the
defendant JOSEPH IORIO.  During the conversation, the defendant
asked the CS to compile trucking prices for the Hudson Yards
Project and advised that the job consisted of approximately
100,000 (cubic) yards of rock and 42,000 (cubic) yards of soil.
At one point during the conversation, IORIO instructed the CS to
"figure me [IORIO] in for like a half a buck [50¢] or something
like that" and "don't put a lot in just put in fifty cents
[50¢]."  Based upon my training and experience, as well as the
investigation conducted thus far and my conversations with the
CS, I believe that IORIO was advising the CS that he expected a
kick back of fifty cents (50¢) per ton of material trucked by the
CS's company, should the CS receive the work.  IORIO further
instructed the CS, "Fifty cents [50¢] is strictly between you
[the CS] and I [IORIO].  Nobody else knows about that . . . not
Yonkers, not nobody."

13.   On October 7, 2008, at the direction of law
enforcement, the CS placed a recorded telephone call to the
defendant JOSEPH IORIO.  During the conversation, the defendant,
in reference to the Hudson Yards Project, told the CS that he
expected a kick-back of twenty-five cents (25¢).[3]  Based upon my

---

[3]      This was a reduction from the defendant's
previously-stated amount of fifty cents (50¢) per ton.

training and experience, as well as the investigation conducted
thus far and my conversations with the CS, I believe that IORIO
was advising the CS that he expected a kick back of twenty-five
cents (25¢) per ton of material trucked by the CS's company,
should the CS receive the work.

14.  Based upon the estimated amount of materials for
this project, at 25¢ per ton, it is estimated that the kick-back
solicited by the defendant JOSEPH IORIO was approximately
$48,250.

B.  The Atlantic Yards Arena Project

15.  On or about February 24, 2005, the MTA and private
developer Forest City Ratner Co. ("FCRC") executed a Letter
Agreement pertaining to a proposed public and privately funded
development project, situated in Kings County, New York,
consisting of, among other things, the relocation and improvement
of the existing MTA LIRR Vanderbilt Yard; the construction of a
new MTA LIRR rail yard; the construction of a new entrance to the
Atlantic Avenue/Pacific Street subway station complex (an MTA
NYCT mass transit improvement); the construction of an arena to
be used by a professional basketball team; and, a mixed use
development consisting of housing, commercial office space, and
retail space (hereinafter, the "Atlantic Yards Arena Project").
The FHWA has appropriated $2,000,000 in grant monies to the
Atlantic Yards Arena Project.

8

16.   On June 25, 2008, at the direction of law enforcement, the CS met with defendant JOSEPH IORIO, among others.  Prior to this meeting, as well as other meetings discussed below, the CS was provided an electronic recording device to record the planned meetings with the defendant.[4]  During the June 25 meeting, IORIO discussed the Atlantic Yards Arena Project and advised the CS that the project involved 350,000 (cubic) yards of material.  IORIO then instructed the CS to prepare trucking and disposal prices for that project.

17.   On June 26, 2008, at approximately 1:45 p.m., the defendant JOSEPH IORIO sent an E mail, from his YCC E mail account, to the CS.  Attached to the message from IORIO was a list of various types of construction site materials, such as structural steel, concrete and contaminated soils, as well as trucking and disposal specifications, in connection with part of the Atlantic Yards Arena Project, specifically, the relocation of the MTA LIRR Vanderbilt Yard.

18.   On June 26, 2008, at approximately 1:49 p.m., the defendant JOSEPH IORIO sent another E mail to the CS, this time from his personal Yahoo E mail account.  In this message, IORIO wrote, "I will call you in the AM check your email I sent you a big job for Yonkers keep it quite [sic] as far as you know it

---

[4]   The recording equipment used at this and other meetings described throughout this affidavit was turned on and off by law enforcement officers.

came from Yonkers direct."

19. On July 2, 2008, at the direction of law enforcement, the CS met with the defendant JOSEPH IORIO. During the July 2 meeting, which was recorded with the consent of the CS, IORIO discussed, among other things, the Atlantic Yards Arena Project. At one point, IORIO instructed the CS to provide him with the CS's trucking and disposal prices and that he (IORIO) would, in turn, provide them to YCC. Later, the CS asked IORIO, "What do I [the CS] figure you [IORIO] in for?", meaning what did IORIO expect in terms of a kick back. IORIO responded, "I think all you'd have to figure me for is like a quarter [25¢] . . . I just need a little something for my work." Based upon my training and experience, as well as the investigation conducted thus far and my conversations with the  CS, I believe that in this portion of the conversation, IORIO explained that he expected to be paid twenty five cents (25¢) per ton of material trucked by the CS's company as a kick-back for getting the work. IORIO further stated that the CS could pay him after the CS got paid for the work.

20. During the same meeting, the defendant JOSEPH IORIO further instructed the CS to provide pricing to another potential bidder on the Atlantic Yards Arena Project at amounts that were a "little higher" than the pricing the CS was to prepare for YCC in order to give YCC a bidding advantage. In



pertinent part, IORIO told the CS, "We want to give the edge to Yonkers because I don't, I control Yonkers more than I control [the other bidder]." Nevertheless, IORIO instructed the CS to "keep me [IORIO] in [the other bid]". In this way, I believe that IORIO instructed the CS to keep his twenty five cents (25¢) per ton kick back included in the pricing for the other bidder. Later in this conversation, as on other occasions, IORIO instructed the CS to make check payments to him payable to JJA Construction and that the payments should be characterized as "consultant fees" on the CS's books.

21.   Later that day, at the direction of law enforcement, the CS E mailed a price proposal to the defendant JOSEPH IORIO and another YCC employee at their respective YCC E mail addresses. The proposal listed the CS's prices for trucking material for the Atlantic Yards Arena Project. The CS advised law enforcement that the prices identified on the proposal sent to YCC included the twenty five cents (25¢) per ton kick back solicited by IORIO.

22.   On July 7, 2008, at the direction of law enforcement, the CS placed a recorded telephone call to the defendant JOSEPH IORIO. During the conversation, IORIO instructed the CS to provide a price proposal to another bidder on the Atlantic Yards Arena Project and to inflate the numbers. In pertinent part, IORIO told the CS, "I [IORIO] want you [the

11

CS] to be like $3.00 a ton higher across the board." Based upon my training and experience, as well as the investigation conducted thus far and my conversations with the CS, I believe that, consistent with his previous conversation with the CS, IORIO wanted to ensure a bidding advantage for YCC.

23.   In or about July or August 2008, YCC submitted a bid proposal to FCRC for construction work on the Atlantic Yards Arena Project to include excavation work for the aforementioned LIRR Vanderbilt Yard relocation.

24.   Based upon the estimated amount of materials for this project, at 25¢ per ton, it is estimated that the kick-back solicited by the defendant JOSEPH IORIO was approximately $131,250.

C.   The MTA Bridges & Tunnels
     Bronx Whitestone Bridge Project

25.   On or about June 2, 2008, MTA B&T advertised a contract for a project known as the "Bronx Whitestone Bridge, Replacement of Bronx Approach and Repairs to Queens Approach, Contract Number BW 89" (the "Bronx Whitestone Bridge Project").

26.   On August 13, 2008, at the direction of law enforcement, the CS met with defendant JOSEPH IORIO. During the ensuing conversation, which was recorded with the consent of the CS, IORIO discussed, among other things, the Bronx Whitestone Bridge Project. During the conversation, IORIO handed the CS a list of materials that would be removed from the project.

12

Referencing the list, IORIO advised the CS, "You [the CS] take
care of me [IORIO] a little bit on each of those without getting
hurt." Later, IORIO specified the "little bit" he expected was a
"quarter." Based upon my training and experience, as well as the
investigation conducted thus far and my conversations with the
CS, I believe that in this conversation, IORIO solicited a
kick-back from the CS in the amount of twenty five cents (25¢)
per ton for the various quantities of materials to be trucked
both into and out of the site. As on previous occasions, IORIO
further acknowledged that the CS should make the kick back
payments to JJA Construction Company.

27. During the same meeting, the defendant JOSEPH
IORIO provided the CS the "Attendance Sheet" for the pre-bid
conference for the Bronx Whitestone Bridge Project. Among other
things, the Attendance Sheet identified the names of those
companies that attended the conference with the interest of
submitting bids for the work. Next to several company names on
the Attendance Sheet, including YCC, an asterisk mark had been
placed. Referencing the Attendance Sheet and the asterisk marks,
IORIO instructed the CS to prepare price proposals for those
companies by the bid date of August 28, 2008. The defendant
further instructed the CS to prepare a price proposal for YCC
which was "a little bit less" than the other potential bidders.

28. On August 18, 2008, at the direction of law

13

enforcement, the CS placed a telephone call to the defendant
JOSEPH IORIO. During the ensuing conversation, which was
recorded with the consent of the CS, IORIO mentioned the pending
YCC bid on the Bronx Whitestone Bridge Project and instructed the
CS to prepare a "spreadsheet" of pricing that the CS could submit
to prospective bidders for the project. Based upon my training
and experience, as well as the investigation conducted thus far
and my conversations with the CS, I believe that IORIO wanted to
inspect this sheet so that he and the CS could discuss the prices
before the CS submitted them to the prospective bidders. At one
point during the conversation, the CS asked IORIO whether the CS
was "putting something in for you", meaning whether the CS should
include a kick back amount for IORIO in the pricing. IORIO
responded, "Yeah, exactly, because I'm not protected in any other
places except with you on this case." I believe that IORIO's
statement reflected that he was to receive a kick-back from the
CS, but no other source in connection with the Bronx Whitestone
Bridge Project.

29. On August 21, 2008, at the direction of law
enforcement, the CS met with defendant JOSEPH IORIO. During this
meeting, which was recorded with the consent of the CS, IORIO
discussed, among other things, the Bronx Whitestone Bridge
Project and the various types of materials that would be trucked
into and out of the work site. At one point, IORIO instructed

14

the CS to send the price proposal to another YCC employee, "once you [the CS] and I [IORIO] agree on it [the bid and kick-back]."

30.   During this same meeting, however, IORIO explained that the payment of a kick-back was contingent on which location was used by the CS to deposit materials that were removed from the work site.   In particular, IORIO advised the CS not to pay him a kick back if the material is to be trucked to "Duraport" (a dumpsite).   However, IORIO continued, "If the Stavola ones [referencing another dumpsite], always figure me [IORIO] for like a quarter [25¢] . . . not a lot".   Based upon my training and experience, as well as the investigation conducted thus far and my conversations with the CS, I believe that IORIO expected to be paid a kick-back in the amount of twenty five cents (25¢) per ton for all material trucked to and from the Bronx Whitestone Bridge Project with the exception of material trucked to Duraport. IORIO further instructed the CS to inflate, by fifty cents per ton, the CS's price proposals to the other prospective bidders in order to give YCC "a little edge".

31.   On August 26, 2008, the CS mailed via UPS, a commercial interstate carrier, various documents, including the CS's trucking and material price proposals in connection with the Bronx Whitestone Bridge Project to ten (10) prospective bidders/prime contractors, including YCC.   Three (3) of the mailings were addressed to prospective bidders located in the

Eastern District of New York.

32.  UPS tracking of the deliveries indicated that the above mailings were in fact delivered to the mail recipients. According to the CS, the price proposals sent to all ten prospective bidders included IORIO's undisclosed kick back of twenty-five cents (25¢) per ton of material trucked with the exception of material trucked to Duraport (as instructed by IORIO during their August 21, 2008 meeting).

33.  On August 27, 2008, the CS mailed via UPS, a commercial interstate carrier, various documents, to include the CS's revised trucking and material price proposals in connection with the Bronx Whitestone Bridge Project to ten (10) prospective bidders/prime contractors, including YCC.  Three (3) of the mailings were addressed to prospective bidders located in the Eastern District of New York.

34.  UPS tracking of the deliveries indicated that the above mailings were, in fact, delivered to all the mail recipients.  According to the CS, the revised price proposals sent to all ten prospective bidders included IORIO's undisclosed kick back of twenty-five cents (25¢) per ton of material trucked with the exception of material trucked to Duraport (as instructed by IORIO during their August 21, 2008 meeting).

35.  Based upon the estimated amount of materials for this project, at 25¢ per ton, it is estimated that the kick-back

16

solicited by the defendant JOSEPH IORIO was approximately $14,592.50.[5]

WHEREFORE, your deponent respectfully requests the issuance of an arrest warrant for the defendant JOSEPH IORIO, so that he may be dealt with according to law.

In addition, it is respectfully requested that this affidavit be filed under seal.

Daniel M. Helzher
Special Agent
U.S. Dept. of Transportation
Office of the Inspector General

Sworn to before me this
_____ of November, 2008

S/ Orenstein

UN1                         E JUDGE
EAS                         I YORK

_____

[5] On September 3, 2008, the defendant JOSPEH IORIO advised the CS, in an E-mail sent from his Yahoo E-mail account, that YCC was not successful in being awarded the contract for the Bronx-Whitestone Bridge Project.

17

